# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| DANIEL L. HART, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CAUSE NO. 1:15-cv-00380-SLC** |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Daniel L. Hart, III, appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI").[1] (DE 1). For the following reasons, the Commissioner's decision will be

AFFIRMED.

## I. PROCEDURAL HISTORY

Hart applied for DIB and SSI in September 2014, alleging disability as of January 1,

2011.[2] (DE 11 Administrative Record ("AR") 233-46). The Commissioner denied Hart's

application initially and upon reconsideration. (AR 122-23, 146-57). On May 26, 2015, a

---

[1] All parties have consented to the Magistrate Judge. (DE 14); *see* 28 U.S.C. § 636(c).

[2] Hart had previously filed an application for disability, which was denied on October 24, 2012, and he did not appeal that decision. (AR 18). Administrative Law Judge William Pierson ("the ALJ") viewed Hart's alleged onset date of January 1, 2011, as an implicit request to reopen his prior claim. (AR 18). The ALJ declined this request, stating that "no new and material evidence has been offered that would establish good cause to reopen the prior decision." (AR 18). Accordingly, the ALJ found that the October 24, 2012, decision was final and binding, and that the period prior to October 25, 2012, would not be readjudicated. (AR 18). Hart does not challenge the ALJ's decision in this respect.

hearing was held before the ALJ, at which Hart, who was represented by counsel, and a vocational expert, Sharon Ringenberg (the "VE"), testified. (AR 41-83). On July 17, 2015, the ALJ rendered an unfavorable decision to Hart, concluding that he was not disabled because he was capable of performing a significant number of jobs in the economy despite the limitations caused by his impairments. (AR 18-34). The Appeals Council denied Hart's request for review (AR 1-14), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

Hart filed a complaint with this Court on December 14, 2015, seeking relief from the Commissioner's final decision. (DE 1). In this appeal, Hart advances just one argument—that the ALJ improperly assessed the credibility of his symptom testimony. (DE 17 at 6-14).

## II. FACTUAL BACKGROUND[3]

At the time of the ALJ's decision, Hart was 25 years old (AR 34, 233); had a high school education (AR 302) with some special education classes (AR 569-70); and had work experience as a forklift operator, a loader and unloader, and a production worker (AR 363). Because Hart does not challenge the ALJ's findings concerning his physical impairments, the Court will focus on the evidence pertaining to his mental impairments.

### A. *Hart's Testimony at the Hearing*

At the hearing, Hart testified that he has full custody of his three children, who all under the age of four, and that he and his children live with his mother and grandmother. (AR 47-48). He was receiving food stamps and had just been approved for Medicaid. (AR 48, 50, 62). He lost his license in December 2013 after an accident, and he no longer drives, stating that it causes

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 691-page administrative record necessary to the decision.

him anxiety.  (AR 49-50).  His mother helps him care for his children, and his mother does all of the cooking.  (AR 59-61).  He has two or three bad days a month where he does not get out of bed and his mother and grandmother care for his children.  (AR 64).  He has a restraining order against his ex-wife, and she is not involved in the children's care.  (AR 63).

Hart had worked after his alleged onset date.  (AR 50-51).  Most notably, from May 2011 to May 2012, he worked up to 35 hours a week unloading trucks and stocking shelves at Walmart.  (AR 51).  During his employment with Walmart, Hart was taking medications "on and off" and was not participating in any mental health treatment.  (AR 67).  Although Walmart disciplined him for missing "a lot" of days, which he estimated was "an average of four days a month," it did not terminate his employment.  (AR 52-54, 65-66, 286).  Rather, he left Walmart because he got what he thought was a "better job" at Family Dollar.  (AR 52).  Hart, however, lost his job at Family Dollar within three weeks due to missing too many days.  (AR 52-53).  Hart then worked at AZZ for a few months, but stated that he lost that job, too, for missing too many days.  (AR 54-55).  After AZZ, he worked at Menards for a few months, again stating that he had lost that job due to absenteeism.  (AR 54-56).  Several days before the hearing, Hart had lost a job at a service station due to absenteeism.  (AR 69).  When asked why he missed so many days at these jobs, Hart testified that his absences were all due to his anxiety and depression.  (AR 55-56, 69).

When asked why he thought he cannot work, Hart stated that he gets very anxious around large groups of people, in that his chest starts hurting and he finds it hard to breathe.  (AR 61, 64-65).  He stated that he has hallucinations on occasion, indicating that they increase in frequency the longer he is off his medications.  (AR 61).  He also indicated that he suffers from

delusions randomly throughout the day, in that he can be walking down the street and a person pops up beside him and then the person is gone two seconds later. (AR 63).

Hart stated that his medications help control these symptoms, reporting that when he takes his medications, the voices and hallucinations "were cut down to almost non-existent" or about a half-hour per week. (AR 58-59). He had not taken any medications for the past six months because he could not afford them, but he planned to resume his medications now that he had Medicaid again. (AR 61-63).

*B. Summary of the Relevant Medical Evidence*

Hart first received mental health treatment in the third grade when he was prescribed medications. (AR 667). Hart stopped treatment in 1996 at the age of 16 because he thought he had "everything under control." (AR 667).

In January 2011, Hart had an initial visit with Dr. Sylvia Rutten, a psychiatrist at the Northeastern Center, telling her that he "has papers he needs filled out for disability and that's why he's here." (AR 667). He stated that his mental health had been worsening for the past three or four years and that he had very little control over his temper. (AR 667). He complained of insomnia, low energy, decreased concentration, feeling restless, paranoia, and worrying. (AR 667-68). He stated that he had suicidal ideation in the past and had attempted suicide twice; he did not have any psychiatric hospitalizations. (AR 668). On exam, he demonstrated intact memory; average intellect; and fair, but somewhat limited, judgment. (AR 668). Dr. Rutten diagnosed Hart with major depressive disorder, recurrent; no psychosis, but rule out history of psychosis; generalized anxiety disorder; history of ODD, possible conduct disorder; family relational issues; and rule out antisocial personality disorder. (AR 669). She assigned him a

current Global Assessment of Functioning ("GAF") score of 50.[4]  (AR 669).  She prescribed

Inderal, stated that she would consider adding additional medications in the future, and

recommended that he continue therapy.  (AR 669).  Hart, however, failed to follow through with

treatment at the Northeastern Center.  (AR 648, 666).

In February 2011, Hart underwent a mental status examination by Michael Scherbinski,

Ph.D., for purposes of his disability application.  (AR 596-600).  He reported having extreme

anxiety in social situations; he stated that he blacks out occasionally when in groups of people

and wakes up chasing or hitting them.  (AR 596).  He also complained of mood swings,

depression, sleeplessness, and hallucinations.  (AR 596).  He hears voices in his head up to six

times a week and sees himself hurting others when he is angry.  (AR 596).  He does not want to

leave his room when feeling depressed.  (AR 596).  He indicated that he has difficulty regulating

his emotions, being around people, and maintaining employment.  (AR 596).  He denied any

current suicidal ideation or thoughts of self-harm.  (AR 596).  Upon mental status exam, Hart

showed no evidence of a thought disorder; his affect appeared anxious.  (AR 598).  His

performance on a mental status exam revealed average judgment and insight, and he was

compliant with all requests.  (AR 600).  He was able to maintain focus and concentration, and he

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000).  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.*  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Id.*  A GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well."  *Id.*

"The American Psychiatric Association no longer uses the GAF as a metric."  *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)).  However, the medical sources of record used GAF scores in assessing Hart, so they are relevant to the ALJ's decision.  *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

demonstrated appropriate communication and social skills throughout the examination. (AR 600). Dr. Scherbinski concluded that Hart's abilities "would likely allow him to potentially gain and/or maintain employment," but that "given his mental health concerns, [he] may have difficulty consistently meeting demands in a work environment." (AR 600). Dr. Scherbinski diagnosed Hart with social phobia (provisional) and assigned him a GAF of 63. (AR 600).

In March 2011, B. Randal Horton, Psy.D., a state agency psychologist, reviewed Hart's record and concluded that he had mild restrictions in activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace. (AR 603-15). Dr. Horton concluded that Hart's mental impairments were not severely limiting. (AR 615). J. Gange, Ph.D., another state agency psychologist, affirmed Dr. Horton's opinion in July 2011. (AR 617).

Hart visited the emergency room for various physical ailments in August 2012, November 2012, January 2013, May 2013, June 2013, July 2013, August 2013, and December 2013, and psychiatric review of systems were negative during those visits. (AR 413-14, 418-26, 429-32, 434-47.)

In July 2013, Hart returned to the Northeastern Center, stating that he needed to get stable so that he could provide for his family. (AR 648-50, 660). He reported a depressed mood, difficulty being around people, anger, fleeting suicidal ideation, broken sleep, racing thoughts, intermittent homicidal ideation, and visual hallucinations. (AR 648, 660). Upon mental status exam in August 2013, the clinician noted a depressed mood, normal psychomotor activity, flat affect, organized thought processes, grossly intact cognition, limited insight and judgment, and no current suicidal or homicidal thoughts. (AR 648-50). He was assigned diagnoses of bipolar

disorder, depressed, severe, and post traumatic stress disorder ("PTSD"). (AR 650). He had a current GAF of 50 and a GAF upon admission of 48. (AR 650).

In September 2013, Hart told a clinician at the Northeastern Center that he was having decreased sleep and increased anxiety. (AR 646). He also reported having auditory and visual hallucinations, as well as suicidal ideation, but he clarified that he did not want to hurt himself due to his children. (AR 646). His mood was depressed and anxious. (AR 647). His memory, attention, concentration, insight, and judgment were all good. (AR 647). His medications were adjusted. (AR 647).

In October 2013, the Northeastern Center noted that there was no increase in Hart's GAF score, "as client is not fully engaged in individual therapy." (AR 661).

In November 2013, Hart told a clinician at the Northeastern Center that he just wanted to stay in bed all day. (AR 643). He was having trouble sleeping. (AR 643). He reported having visual hallucinations up to four times a week. (AR 643). He had lingering thoughts of self harm, but no thoughts of violence toward others. (AR 644). He had a depressed mood and a blunted affect. (AR 644). The clinician adjusted his medications and indicated diagnoses of bipolar disorder and PTSD. (AR 644).

In early December 2013, Hart reported to a clinician at the Northeastern Center that he was just staying in bed. (AR 641). He stated that his hallucinations had lessened, but that they increased if he missed a medication dosage. (AR 641). He reported suicidal ideation up to three times a day and thoughts of violence toward others. (AR 641). His mood swings varied. (AR 642). His medications were adjusted. (AR 642).

Later in December 2013, Hart reported to Dr. Teresa Greiner at the Northeastern Center

that he continued to have mood swings. (AR 639). His hallucinations decreased since being on Invega, and he had no thoughts of hurting himself or others. (AR 639). His mood was anxious and depressed, and his affect was quite flat. (AR 639). He had normal attention and concentration, insight and judgment, and thought process. (AR 639). She assessed bipolar disorder, mixed, with ongoing symptoms; and PTSD, with ongoing symptoms. (AR 640). She adjusted his medications. (AR 640).

In January 2014, Hart told Dr. Greiner that his mood was better overall and although he still had mood swings, they were significantly better. (AR 637). His mood was flat, but he had normal thought process and content, intact memory and attention, and intact insight and judgment. (AR 637). He had no suicidal or homicidal thoughts. (AR 637). Diagnoses included bipolar disorder, depressed with psychotic features, improved with medication, but ongoing residual symptoms; and PTSD, improving. (AR 638). Dr. Greiner adjusted his medications. (AR 638).

In April 2014, Hart's chart was closed at the Northeastern Center due to no engagement of services since January 2014. (AR 663).

In July 2014, Hart returned to the Northeastern Center and underwent a psychiatric evaluation by Dr. Greiner. (AR 634-35). She noted that he had quit coming to the clinic earlier in the year and had gone off of his medications after he ran out of them, as he did not have insurance. (AR 634). He reported worsening anxiety and panic attacks, particularly when around crowds; worsening auditory and visual hallucinations; poor concentration; racing thoughts; insomnia; mood swings; anger; irritability; paranoia; and suicidal and homicidal thoughts. (AR 634). He had been in a fight a week earlier. (AR 634). A mental status exam

revealed a flat affect and depressed mood, but intact attention, concentration, and memory. (AR 635). Dr. Greiner assigned him a current GAF of 50 and diagnoses of schizoaffective disorder bipolar type and PTSD. (AR 635). She restarted his medications, and noting Hart's problems with medication compliance, she prescribed Invega Sustenna injections rather than Invega in tablet form. (AR 635).

In August 2014, Hart reported decreased sleep, panic attacks, paranoia, and depression, indicating that the Invega Sustenna injections were helping. (AR 630-33). He still, however, could not stay in a grocery store due to his paranoia. (AR 630, 632). He had persecutory delusions, but no hallucinations or suicidal ideation. (AR 630-33). Hart also visited the emergency room in August 2014 due to a panic attack. (AR 484-85, 632).

In September 2014, Hart had a depressed mood, an appropriate affect, normal thought processes, and no hallucinations or suicidal ideation. (AR 628-29). He was positive for persecutory delusions. (AR 629). He demonstrated normal attention and concentration, intact memory, and good judgment. (AR 629). His medications were adjusted. (AR 629). That same month, Hart told a family practitioner that he was feeling nervous, depressed, and had insomnia. (AR 469).

In October 2014, Dr. Horton, a state agency psychologist, reviewed Hart's record and concluded that he had a mild restriction in activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (AR 104-08). More specifically, Dr. Horton opined that Hart was moderately limited in: (1) carrying out detailed instructions; (2) maintaining attention and concentration for extended periods; (3) completing a normal workday

and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; and (4) maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness. (AR 105-07). He was not significantly limited in the remaining mental categories. (AR 105-07). Dr. Horton wrote that Hart handles change and stress poorly. (AR 108). However, Dr. Horton further observed that Hart's past employer represented that its only concern was Hart's attendance, as there were no concerns with his completing tasks, working with co-workers and supervisors, concentration, safety, or asking for help. (AR 108). Dr. Horton concluded that Hart's reports were "partially credible" and that he could perform unskilled work. (AR 108). Dr. Horton's opinion was affirmed by F. Kladder, Ph.D., another state agency psychologist, in January 2015. (AR 129, 132).

Hart visited the emergency room for various physical ailments in November 2014 and December 2014, and psychiatric review of systems were negative during those visits. (AR 544-54). In January 2015, Hart visited the emergency room for sinusitis; a review of systems was "[p]ositive for multiple psychiatric issues." (AR 542).

### III. ANALYSIS

#### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

### B. The Commissioner's Final Decision

On July 17, 2015, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 18-34). The ALJ noted at step one of the five-step analysis that Hart had worked at several jobs after October 2012 and that his income had exceeded the level of disqualifying substantial gainful activity in at least a portion of 2013; however, because

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

Hart's other earnings had been minimal, the ALJ proceeded to the next step.  (DE 21).

At step two, the ALJ found that Hart had the following severe impairments: PTSD/anxiety, major depressive disorder/bipolar disorder/schizoaffective disorder, and history of learning disorder.  (DE 21).  At step three, the ALJ concluded that Hart did not have an impairment or combination of impairments severe enough to meet or equal a listing.  (AR 25).  Before proceeding to step four, the ALJ determined that Hart's symptom testimony was not entirely credible (AR 29) and assigned the following RFC:

> [T]he claimant has the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to simple, routine, and repetitive tasks that can be learned with short demonstration or up to 30 days; can maintain the concentration required to perform simple work tasks, can make simple work-related decisions, and can complete simple work-like procedures; limited to low stress jobs defined as requiring only occasional decision-making and only occasional changes in the work setting, but can tolerate predictable changes in the work environment; can meet production requirements in an environment that allows him to sustain a flexible and goal-oriented pace, but is limited from fast-paced work such as assembly line production work with rigid or strict productivity requirements; limited to superficial interactions with coworkers and supervisors, with superficial interaction defined as occasional and casual contact not involving prolonged conversation; contact with supervisors still involves necessary instruction; no work with the general public.

(AR 27).

Based on this RFC and the VE's testimony, the Commissioner concluded at step four that Hart was unable to perform any of his past relevant work.  (AR 32).  At step five, however, the Commissioner found that there were a significant number of other jobs in the economy that Hart could perform, including routing clerk, mail sorter, and retail marker.  (AR 33).  Accordingly, Hart's applications for DIB and SSI were denied.  (AR 33-34).

*C. The ALJ's Credibility Determination Will Be Affirmed*

Hart's sole argument on appeal is that the ALJ improperly analyzed the limiting effect of his mental health symptoms. Hart's challenge is two-fold—that the ALJ failed to apply the proper analytical framework when assessing his symptom testimony, and that the ALJ's credibility determination is not supported by substantial evidence and is based on factual and logical flaws. Ultimately, Hart's arguments do not warrant a remand of the ALJ's credibility determination.

1. Applicable Law

The regulations describe a two-step process for evaluating a claimant's symptom testimony. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996);[6] *see* 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment—that is, an impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *see* 20 C.F.R. §§ 404.1529, 416.929. This finding "does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). If the record does not allow the ALJ to make such a finding, then that ends the inquiry, for a finding of disability cannot be made solely on the basis of the claimant's symptoms, even if they appear genuine. SSR 96-7p, 1996 WL 374186, at *2

_____

[6] Social Security Ruling 96-7p was superseded by Social Security Ruling 16-3p in March 2016, *see* SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016), but Social Security Ruling 96-7p governed at the time the ALJ issued his decision, and both parties refer to Social Security Ruling 96-7p in their brief. Accordingly, SSR 96-7p applies to this case. Notably, the Commissioner retained in SSR 16-3p the same two-part analytical framework as articulated in SSR 96-7p.

(July 2, 1996).

Second, if the medical evidence shows the existence of an underlying impairment that could be reasonably expected to produce the claimant's symptoms, the ALJ must evaluate "the intensity, persistence, and functionally limiting effects of the symptoms . . . to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996); *see* 20 C.F.R. §§ 404.1529(c), 416.929(c); *see, e.g.*, *Clifford*, 227 F.3d at 871 n.6. For this purpose, "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). In doing so, the ALJ must consider, in addition to the objective medical evidence: the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate symptoms; treatment, aside from medication, the claimant has received; and any other measures the claimant uses to relieve symptoms. SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996); *see* 20 C.F.R. §§ 404.1529(c), 416.929(c).

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988) (citation omitted), creating "an accurate and logical bridge between the evidence and the result,"

14

*Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citation omitted), his determination will

be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see Carradine v. Barnhart*,

360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the

ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the

witness . . . ." (citation omitted)). "[Because] the ALJ is in the best position to observe

witnesses, [courts] usually do not upset credibility determinations on appeal so long as they find

some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335

(7th Cir. 1994) (citations omitted).

2.  The ALJ Adequately Applied the Two-Step Analytical Framework in Assessing

Hart's Symptom Testimony

When assessing Hart's symptom testimony, the ALJ acknowledged and set forth the two-

step process described above. (AR 28). Therefore, it is apparent that the ALJ understood the

proper analytical framework to employ when assessing Hart's credibility. Then, when issuing

his credibility determination, the ALJ summarized:

> After careful consideration of the evidence, the undersigned finds that the
> claimant's medically determinable impairments could reasonably be expected to
> cause some of the alleged symptoms; however, the claimant's statements
> concerning the intensity, persistence and limiting effects of these symptoms are
> not entirely credible for the reasons explained in this decision. The claimant's
> allegations are credible in so far as they are consistent with the above noted
> [RFC].

(AR 29). As to "the reasons explained in [the] decision" (AR 29), the ALJ cited the objective

medical evidence, Hart's treatment history, the consistency of his statements, the medical source

opinions, information from other sources, his work history, and his daily activities. (AR 21-32).

In challenging the ALJ's application of the two-step framework, Hart argues that the ALJ

materially erred by failing to make an explicit finding whether his testimony was consistent with the objective medical evidence, before going on to consider his treatment history, the consistency of his statements, the medical source opinions, information from other sources, his work history, and his daily activities. As Hart parses the analytical framework, once the claimant shows that he has a medically determinable impairment that can reasonably cause his alleged symptoms, "the Commissioner is required to muster substantial evidence showing that the claimant's allegations are inconsistent with the objective evidence and he is not disabled." (DE 17 at 8). More to the point, Hart argues that the ALJ may only consider other evidence—such as medical source opinions, information from other sources, daily activities, medication, and treatment—"if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of the objective medical evidence.'" *Curvin v. Colvin*, 778 F.3d 645, 648 n.3 (7th Cir. 2015) (quoting SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996)).

The Commissioner disagrees with Hart's parsing of the two-part analytical framework in SSR 96-7p. The Commissioner emphasizes that there is no requirement that an ALJ make an explicit statement as to whether the objective medical evidence supports the asserted intensity and persistence of a claimant's symptoms. Rather, the Commissioner urges that "[a]ll that is required is that the decision 'contain specific reasons for the finding on credibility, supported by the evidence in the case record,' which is 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" (DE 22 at 6 (quoting SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996))).

The Court agrees with the Commissioner. In fact, Hart even concedes in his reply brief that there is no authority requiring an ALJ to make an explicit finding as to whether objective medical evidence supports the asserted intensity and persistence of his symptoms. (DE 23 at 2). Rather, as Hart acknowledges, "[i]n rendering a decision, the ALJ must build a logical bridge from the evidence to his conclusion." (DE 23 at 2 (quoting *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005))). The Seventh Circuit Court of Appeals has not asked for more when considering an ALJ's credibility determination, explaining that "an ALJ's credibility assessment will stand as long as [there is] some support in the record." *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (alteration in original) (citation omitted); *see generally Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-69 (7th Cir. 2010) ("[T]idy packaging" is not required in ALJs' decisions because the courts read them "as a whole and with common sense." (citations omitted)); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." (citations omitted)).

Therefore, to the extent that Hart suggests the ALJ's application of the two-step credibility framework—that is, the ALJ's failure to make an explicit finding concerning whether his symptom testimony is consistent with the objective medical evidence—by itself, requires a remand, that assertion is unpersuasive. It is readily apparent that the ALJ implicitly found that the objective medical evidence, standing alone, is insufficient to substantiate Hart's symptom testimony. Nor can the Court fault the ALJ for this finding, considering that Hart alleges an onset date of January 2011 and there is a more than two-year gap (after February 2011 until August 2013) in the objective medical evidence after his alleged onset date.

3. The ALJ's Credibility Determination Is Supported by Substantial Evidence, Adequately Articulated, and Not Patently Wrong

Setting aside the ALJ's application of the two-step framework, Hart alleges several other material flaws in the ALJ's credibility determination. These include: (1) that the ALJ selectively reviewed the objective medical evidence; (2) that the ALJ impermissibly drew a negative inference from Hart's failure to seek treatment without first exploring his explanation for that failure; (3) that his work history supports, rather than undermines, his symptom testimony; and (4) that his caring for his three young children does not contradict his symptom testimony. The Court will address each of these arguments in turn.

As to the objective medical evidence, Hart argues that some of his mental status examinations from August 2013 through September 2014 reveal positive findings consistent with his assertion of disabling mental health symptoms. Specifically, he cites findings from various notes reflecting "depressed, anxious, blunted, irritable, or manic moods; persecutory delusions; anger; limited insight and judgment; suicidal and homicidal thoughts; poor grooming; paranoia; psychomotor retardation; flat affect; decreased eye contact; decreased concentration; slow speech with 'vague responses'; violent thoughts; flashbacks; racing thoughts; auditory and visual hallucinations; and dissociation." (DE 17 at 9 (citing AR 628, 630, 633-34, 636-37, 639, 641-44, 646, 648-49, 651-52)). Hart contends that the ALJ ignored this line of evidence reflecting more severe symptoms, instead selectively summarizing that Hart had a depressed mood, a flat affect, and that he improved with medications. (DE 17 at 9-10 (citing AR 29-30)).

"An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a

disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)); *see also Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). "The ALJ must evaluate the record fairly." *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). "But an ALJ need not mention every piece of evidence, so long [as] he builds a logical bridge from the evidence to his conclusion." *Denton*, 596 F.3d at 425 (citing *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)).

Here, when considering the medical evidence, the ALJ first noted that there was *no* objective medical evidence after February 2011 until July 2013 (AR 30)—a point which Hart does not challenge. The ALJ then observed that Hart presented to the Northeastern Center for care in July 2013 after a more than two-year gap in treatment, and he was placed on medications. (AR 29 (citing AR 648-50, 660-61)). The ALJ noted that a December 2013 note indicated that once back on medications, Hart's hallucinations lessened, but that if he missed a dose, his hallucinations increased. (AR 29 (citing AR 641)). The ALJ further observed that by January 2014 Hart's mood and mood swings were significantly better with medications, but he then failed to return for treatment. (AR 29 (citing AR 637)). The ALJ noted that six months later, in July 2014, Hart returned for care after he had been off of his medications and his anxiety, depression, and delusions had increased. (AR 29 (citing AR 635)). The ALJ observed that at this visit, Hart's attention and concentration were intact, but "[o]n the other hand, affect was flat, and mood was depressed." (AR 29 (citing AR 635)). The ALJ then stated that "while symptoms continued over the next two months (medication adjustments were made), by August 20, 2014, [Hart] reported that mood was 6/10 and that Invega was helping 'some'"; however, he again failed to return for treatment after September 2014. (AR 30 (citing AR 630)).

It is true that the ALJ did not articulate every symptom or finding in the Northeastern Center's records for the period of August 2013 through September 2014. For example, the ALJ did not mention that at his July 2014 visit, Hart also reported auditory and visual hallucinations and paranoid delusions, as well as intermittent suicidal and homicidal thoughts without intent. (AR 635). But having said that, the ALJ's summary of the medical evidence was not unfair. *See Golembiewski*, 322 F.3d at 917. It is obvious that the ALJ considered all of the evidence of record, as he cited the records throughout his decision. (*See* AR 29-30). Ultimately, the ALJ deduced that Hart's symptoms significantly improved with medications (AR 32), which Hart admitted at the hearing (AR 58-59), but that he often failed to seek treatment or otherwise comply with treatment (AR 32). Accordingly, the ALJ went on to consider Hart's reasons for failing to consistently seek and comply with treatment. In that an ALJ "must only minimally articulate his or her justification for rejecting or accepting specific evidence of disability," the ALJ in this instance sufficiently met this "lax standard" with respect to the medical evidence from August 2013 through September 2014. *Berger*, 516 F.3d at 545 (citation and internal quotation marks omitted).

Hart next argues that the ALJ violated SSR 96-7p by impermissibly drawing a negative inference from his failure to seek treatment without first inquiring into and considering his explanation for that failure. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) ("[T]he ALJ 'must not draw any inferences' about a claimant's condition from [the claimant's failure to seek treatment] unless the ALJ has explored the claimant's explanations as to the lack of medical care." (quoting SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996)). Hart acknowledges that the ALJ considered that his "treatment has been limited due to the lack of insurance and money"

(AR 29), but Hart emphasizes that he provided this reason to the ALJ only as to why he stopped treatment at the Northeastern Center in 2014. (AR 50). As Hart sees it, the ALJ should have inquired about his reasons for limited treatment during January 2011 to July 2013 before inferring that his limited finances was the only reason for his limited treatment throughout the entire period.

Hart's argument is unpersuasive. The ALJ considered Hart's testimony concerning his limited finances and lack of insurance, as well as that Hart stated he had recently been approved for Medicaid and would be returning for care to the Northeastern Center. (AR 28; *see* AR 50 ("Q Now, are you receiving treatment through the Northeastern Center still? A I would if I had insurance.")). The ALJ observed, however, that no additional records were ever submitted to show that Hart actually had, in fact, renewed treatment at the Northeastern Center once he had Medicaid. (AR 30). The ALJ also noted that Hart's noncompliance could only be partially explained by a lack of funds because Hart was frequently given medication samples. (AR 29-30).

Furthermore, although it is true that "people with serious psychiatric problems are often incapable of taking their prescribed medications consistently," *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011), here the ALJ accurately observed that Hart was employed by Walmart from May 2011 to May 2012 (AR 28) and that when Hart did visit the emergency room between October 2012 and December 2013, *none* of these records reflect complaints or observations of mental illness (AR 30 (citing AR 413-21, 422-47)). These facts diminish any argument that Hart's mental illness rendered him incapable of complying with his medications. In any event, Hart's failure to seek and comply with treatment was just one of several factors that the ALJ considered when assessing Hart's symptom testimony.

Next, Hart challenges the ALJ's consideration of his work history when discounting his symptom testimony. The ALJ found that Hart's employment at Walmart for one year after his alleged onset date was "inconsistent with ongoing, problematic absenteeism" (AR 31), particularly considering that Hart was not participating in mental health treatment at the time and that he was taking medications only "on and off." (AR 25). But Hart suggests that his work history supports, rather than undermines, his symptom testimony. He states that he was fired by Family Dollar in 2012 after just three weeks due to absenteeism, fired by AZZ in 2013 for either fighting or absenteeism, fired by Menards in 2014 after one month due to absenteeism; and recently fired from his job at a gas station also for absenteeism. (AR 52-55, 69, 342). He adds that although he was not fired by Walmart, he was disciplined for missing work "a lot" of days, which he estimated was "an average of four days a month." (AR 53-54, 65-66, 286).

Although the Seventh Circuit has held that a claimant's poor work history may not count against him when the evidence demonstrates that his medical impairments prevented him from working, *see Sarchet v. Chater*, 78 F.3d 305, 308 (7th Cir. 1996), here the ALJ concluded that, due to discrepancies in the record, Hart did not demonstrate that his mental illness kept him from working. (AR 21, 26, 28-32). The ALJ first observed that although Hart testified that he was fired from AZZ due to absenteeism, in earlier function reports both he and his wife stated that he was fired due to fighting with a coworker. (AR 21 (citing AR 55-56, 329, 339, 383)). Second, although Hart testified that his anxiety and depression were the only reasons for his absenteeism at all of his jobs (AR 56), the ALJ observed that of his three absences and one late arrival recorded by Menards, one was due to the death of a friend and another was due to hurting his back. (AR 31). Menards further indicated that there were no problems with Hart's performance, his ability to get along with others, his ability to work without excessive breaks, or his ability to

concentrate.  (AR 31 (citing AR 342-44)).

Additionally, the ALJ noted that although Hart testified that he missed an average of four days a month at Walmart (AR 65-66), records from Walmart indicate that he missed, on average, no more than one day per month during the year in which he was employed there (AR 30 (citing AR 284-95)).  The ALJ also considered that after working at Walmart for one year, he left Walmart only because he "thought [he] had a better job" at Family Dollar (AR 52; *see* AR 286), which the ALJ found inconsistent with Hart's claim of ongoing, problematic absenteeism.  (AR 31).  Accordingly, on this record, the Court cannot fault the ALJ's conclusion that Hart's work history undercut his symptom testimony, at least to some extent.  *See Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (considering claimant's work history when discounting his credibility); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996) (directing the ALJ to consider a claimant's "prior work record and efforts to work" as part of the credibility determination).

Finally, Hart takes issue with the ALJ's conclusion that his ability to be the primary caregiver for his three young children undermines his claim of disabling mental symptoms.  (AR 25).  Hart contends that the ALJ ignored the fact that his mother and grandmother help care for his children, particularly on his bad days.  But the ALJ did not ignore this evidence; rather, the ALJ specifically stated that Hart had full custody of his children and that his mother and grandmother assist him at times.  (AR 25).  The ALJ simply concluded that Hart's "ability to care for three children under the age of three, *even with help*, attests to a higher level of persistence" than Hart described.  (AR 26 (emphasis added)).  Furthermore, Hart testified that when he was still married, his wife refused to care for the children and his mother stayed with them only when he was working.  (AR 25, 63-64).  As such, the ALJ's observation that Hart "has had primary responsibility for three very young children throughout the period at issue" is

an accurate representation of the record.[7] (AR 25, *see also* AR 31); *see Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005) (stating that an ALJ is entitled to consider a claimant's performance of daily activities as a factor in the credibility assessment); 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Moreover, the ALJ ultimately did credit Hart's symptom testimony in significant part. To accommodate his mental impairments, the ALJ assigned him an RFC with a host of mental restrictions, including simple, repetitive tasks; low-stress jobs; no fast-paced work; superficial interactions with coworkers and supervisors; and no contact with the general public. (AR 27); *see, e.g.*, *Vincent v. Astrue*, No. 1:07-CV-28, 2008 WL 596040, at *16 (N.D. Ind. Mar. 3, 2008) (affirming the ALJ's credibility determination where he discredited the claimant's symptoms only in part).

In sum, an ALJ's credibility assessment will stand as long as there is some support in the record. *Berger*, 516 F.3d at 546 (affirming the ALJ's credibility determination because it was not "patently wrong" or "divorced from the facts contained in the record" (citation omitted)). In this instance, the ALJ built an adequate and logical bridge between the evidence of record and his conclusion about the credibility of Hart's symptom testimony, *see Ribaudo*, 458 F.3d at 584, and his conclusion is not "patently wrong," *Powers*, 207 F.3d at 435. Therefore, the ALJ's credibility determination will stand.

---

[7] Hart also argues that the ALJ ignored that he told the Northeastern Center that his "kids are his safety," and although he has had suicidal ideation at times, he would not hurt himself due to his kids. (AR 643, 646). However, an ALJ "need not address every piece of evidence in [his] decision." *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002) (citation omitted). This comment does not rise to "an entire line of evidence that is contrary to the [ALJ's] ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) ("Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." (citations omitted)).

## IV.  CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Hart.

SO ORDERED.

Entered this 31st day of March 2017.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge